UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

| | |
|---|---|
| RANDY GREEN,<br><br>Plaintiff,<br><br>v.<br><br>GEORGE PAZ, TIMOTHY WENTWORTH, ERIC SLUSSER, DAVID QUELLER, JAMES HAVEL, MAURA BREEN, WILLIAM DELANEY, ELDER GRANGER, NICHOLAS LAHOWCHIC, THOMAS MACMAHON, FRANK MERGENTHALER, WOODROW MYERS, RODERICK PALMORE, WILLIAM ROPER, AND SEYMOUR STERNBERG,<br><br>Defendants,<br><br>-and-<br><br>EXPRESS SCRIPTS HOLDING COMPANY,<br><br>Nominal Defendant. | SHAREHOLDER DERIVATIVE COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Randy Green, by his undersigned attorneys, for his verified shareholder derivative complaint, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows:

## SUMMARY OF ACTION

1.  This is a shareholder derivative action on behalf of nominal defendant Express Scripts Holding Company ("Express Scripts" or "the Company"), a Delaware corporation, against certain of its officers and directors for breach of fiduciary duty. Express Scripts is a pharmacy benefit manager (PBM) headquartered in St. Louis, Missouri.

2.     A PBM is a third party administrator of prescription drug programs for commercial health plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program, and state government employee plans. PBMs aggregate the buying power of enrollees through their client health plans, enabling plan sponsors and individuals to obtain lower prices for their prescription drugs through price discounts from retail pharmacies, rebates from pharmaceutical manufacturers, and the efficiencies of mail-service pharmacies.

3.     This case arises out of Express Scripts' contractual relationship with its largest client, Anthem Inc. ("Anthem"). Anthem is one of the largest health benefits companies in the United States and accounts for approximately 14% of Express Scripts' annual revenues. The current contract between Anthem and Express Scripts was signed in 2009 and has a term of 10 years. Pursuant to the contract, Express Scripts is the exclusive provider of PBM services to Anthem.

4.     Drug pricing is a major component of healthcare costs and can change significantly over time. The Anthem contract therefore provides that every three years, Anthem may conduct a market analysis to ensure that it is receiving "competitive benchmark pricing" on drugs purchased through plans administered by Express Scripts. If Anthem determines that the pricing terms under the Anthem contract are not market competitive, Anthem may propose new terms, and Express Scripts is obligated to negotiate in good faith over the proposal.

5.     In or about 2011 and 2012 (as the initial three year term of the contract was expiring), Anthem initiated drug pricing negotiations under the benchmark provision. The parties reached an agreement to reduce pricing, but only after a contentious dispute. In or about late 2014 (as the second three year term neared expiration), Anthem again concluded that it was paying too much - approximately $3 billion per year over benchmark pricing, $13 billion more over the remaining term, and up to $1.8 billion more during a post-termination period provided for in the contract.

2

6.      Meanwhile, as a dispute between Anthem and Express Scripts was developing under the benchmarking provision, Anthem also contended that Express Scripts was failing to perform services adequately under the contract. In February 2015, Anthem sent Express Scripts a lengthy notice of breach of contract, detailing Express Scripts' operational failures.

7.      Shortly thereafter, in March 2015, Anthem formally notified Express Scripts that drug pricing it was receiving was not market competitive, shared its proposal with Express Scripts, and sought negotiations. However, Express Scripts would not engage, leading Anthem to serve a formal notice of breach of contract in April 2015. For the duration of 2015 and into 2016, as Anthem tried to move the process forward, Express Scripts maintained it had no obligation to negotiate.

8.      This unfolding breakdown in the relationship was setting the stage for litigation and the failure of the contract. Nevertheless, certain individual Express Scripts officers continued to publicly describe Express Scripts' relationship with Anthem, its biggest and most important client, as "*great*," "*very, very solid*," "*business as usual*," and "*strong and sound*."

9.      In January 2016, however, Anthem's Chief Executive Officer ("CEO") Joe Swedish stated at a health care conference that Anthem was entitled to savings of $3 billion a year under its contract with Express Scripts, and intimated that a renewal of the contract beyond 2019 was uncertain. In March 2016, after its concerns regarding Express Scripts' operational breaches and drug pricing remained unaddressed, Anthem filed a lawsuit against Express Scripts in the U.S. District Court for the Southern District of New York, alleging breach of contract and seeking termination.

10.     According to Anthem's lawsuit, Express Scripts deliberately delayed the repricing process for months, refused to negotiate in good faith over Anthem's pricing proposals for competitive benchmark pricing,  expressly repudiated its contractual obligations to reprice to "ensure Anthem receives competitive benchmark pricing," and failed to offer anything close to competitive

3

benchmark pricing, as required. In addition, Anthem alleged that Express Scripts materially breached its obligation to perform material operational duties in a "prudent and expert manner" due to Express Scripts' system defects, chronic failure to devote sufficient resources, inadequate training of personnel, inordinately high employee turnover, and lack of required expertise.

11.     Because Anthem was Express Scripts' most significant client, these revelations were material to investors and shareholders, and they caused a massive decline in the price of Express Scripts stock, wiping out billions of dollars in shareholder value. Indeed, prior to the initial disclosure of the drug pricing problems by Anthem's CEO in January 2016, the price of Express Scripts' stock was approximately $85 per share. After the January 2016 disclosure by Anthem's CEO and the March 2016 filing of Anthem's lawsuit against Express Scripts, however, the price of Express Scripts' stock sank to approximately $69, a decline of almost 20%, causing billions in stock losses.

12.     Securities class action litigation was promptly filed against Express Scripts and its executives on May 4, 2016 by purchasers of Express Scripts stock during the period February 24, 2015 through March 21, 2016, in an action captioned *In re Express Scripts Holding Company Securities Litigation*, No. 16-3338-ER (S.D.N.Y.).

13.     In an amended complaint filed by lead plaintiff Teachers Insurance and Annuity Association of America ("TIAA") on October 14, 2016, it is alleged that during the class period, Express Scripts and its executives made positive statements to the market about Express Scripts' relationship with Anthem, while failing to timely disclose that, among other things, (a) the Company's relationship with Anthem, its most important client, had soured and severely deteriorated, (b) Anthem was demanding more less than *$15 billion* in contract concessions, (c) the Company's amortization accounting under Generally Accepted Accounting Principles ("GAAP") for the contract had been improper during the class period, and (d) the valuable Anthem contract was unlikely to be renewed.

4

14.     Defendants' conduct has not only caused a massive decline in shareholder value, but has also exposed Express Scripts to huge liability to stock purchasers in the securities class action. Indeed, TIAA as the class representative has claimed it lost of up to $50 million *alone*. The officers and directors of Express Scripts owe fiduciary duties of care and loyalty to the Company, including a duty to ensure that it maintained effective internal controls over its important contracts and its disclosures to shareholders. They breached these duties. The material performance and disclosure failures alleged herein were directly within the purview of the Company's officers and directors.

15.     By utterly failing to ensure that adequate controls and procedures were in place during this time, and by causing the Company to issue false statements, each member of the Board of Directors acted in bad faith and faces a substantial likelihood of liability for breach of fiduciary duty. Under these circumstances, any demand on the Board to bring the asserted claims would be futile, and is therefore excused. The directors further lack independence and would never act in a way that might threaten their substantial compensation from Express Scripts, also excusing demand.

16.     This action seeks to recoup losses that Express Scripts has sustained, and will continue sustaining, in connection with the Anthem dispute and all related proceedings.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

18.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of Missouri, or is an individual with sufficient minimum contacts with this District so as to render the exercise of

5

jurisdiction permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Express Scripts maintains its principal place of business in this District, one or more of the defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

20.     Plaintiff Randy Green ("Green") is a current holder of Express Scripts stock and has held his shares continuously since at least 2012. Green is a citizen of California.

### Nominal Defendant

21.     Nominal Defendant Express Scripts is a public company traded on the Nasdaq under the symbol ESRX. Express Scripts purports to be the largest stand-alone PBM company in the United States, offering services to managed care organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans, government health programs, providers, clinics, hospitals and others. Express Scripts is a citizen of Missouri.

### Director Defendants

22.     Defendant George Paz ("Paz") has been a director since 2004 and has served as Chairman since 2006. He also served as CEO from April 2005 to May 2016, as President from October 2003 to February 2014, and as Senior Vice President and Chief Financial Officer from January 1998 to April 2004. In 2015, Paz received $14.8 million in compensation. Paz has been sued for fraud in the securities class action. On information and belief, Paz is a citizen of Missouri.

23.     Defendant Timothy Wentworth ("Wentworth") has been a director since 2015 and

6

became President in 2014. Wentworth has been Express Scripts' CEO since May 2016. On information and belief, Wentworth is a citizen of Missouri. In 2015, Wentworth received $8.4 million in compensation. Wentworth has been sued for fraud in the securities class action. On information and belief, Wentworth is a citizen of Missouri.

24.     Defendant Eric Slusser ("Slusser") served as Executive Vice President and Chief Financial Officer at relevant times. In 2015, Slusser received $1.6 million in compensation. Slusser has been sued for fraud in the securities class action. On information and belief, Slusser is a citizen of Missouri.

25.     Defendant David Queller ("Queller") has been Express Scripts' Senior Vice President of Sales and Account Management since July 2014. Queller has been sued for fraud in the securities class action. On information and belief, Queller is a citizen of Missouri.

26.     Defendant James Havel ("Havel") served as Interim Chief Financial Officer at relevant times. In 2015, Havel received $7.2 million in compensation. Havel has been sued for fraud in the securities class action. On information and belief, Havel is a citizen of Missouri.

27.     Defendant Maura Breen ("Breen") has been a director since 2004. For fiscal year 2015, Breen received $278,500 in compensation. On information and belief, Breen is a citizen of Florida or Massachusetts.

28.     Defendant William Delaney ("Delaney") has been a director since 2011. For fiscal year 2015, Delaney received $295,500 in compensation. On information and belief, Delaney is a citizen of Texas.

29.     Defendant Elder Granger ("Granger") has been a director since 2015. For fiscal year 2015, Granger received $157,854 in compensation. On information and belief, Granger is a citizen of Colorado.

30.     Defendant Nicholas LaHowchic ("LaHowchic") has been a director since 2001. For fiscal year 2015, LaHowchic received $286,000 in compensation. On information and belief, LaHowchic is a citizen of Florida.

31.     Defendant Thomas MacMahon ("MacMahon") has been a director since 2001. For fiscal year 2015, MacMahon received $307,500 in compensation. On information and belief, MacMahon is a citizen of New Jersey or Florida.

32.     Defendant Frank Mergenthaler ("Mergenthaler") has been a director since 2009. For fiscal year 2015, Mergenthaler received $293,750 in compensation. On information and belief, Mergenthaler is a citizen of New Jersey.

33.     Defendant Woodrow Myers ("Myers") has been a director since 2007. For fiscal year 2015, Myers received $292,500 in compensation. On information and belief, Meyers is a citizen of Indiana.

34.     Defendant Roderick Palmore ("Palmore") has been a director since 2014. For fiscal year 2015, Palmore received $270,000 in compensation. On information and belief, Palmore is a citizen of Illinois.

35.     Defendant William Roper ("Roper") has been a director since 2012. For fiscal year 2015, Roper received $271,750 in compensation. On information and belief, Roper is a citizen of North Carolina.

36.     Defendant Seymour Sternberg ("Sternberg") has been a director since 1992. For fiscal year 2015, Sternberg received $288,500 in compensation. On information and belief, Sternberg is a citizen of New York.

37.     Defendants Paz, Wentworth, Breen, Delaney, Granger, LaHowchic, MacMahon, Mergenthaler, Myers, Palmore, Roper and Sternberg are sometimes collectively referred to herein as

8

the Director Defendants.

38.     The Director Defendants and defendants Slusser, Queller and Havel are sometimes collectively referred to herein as the Individual Defendants.

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

39.     By reason of their positions as officers, directors, and fiduciaries of Express Scripts and because of their ability to control its affairs, each of the Individual Defendants owed Express Scripts and its shareholders fiduciary duties of care and loyalty in the management and administration of Express Scripts' affairs, as well as in the use and preservation of Express Scripts' property and assets. As such, they were required to act in furtherance of the best interests of Express Scripts and its shareholders and prohibited from engaging in self-dealing and unlawful corporate conduct, such as violations of the laws applicable to Express Scripts and its business.

40.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate complete, accurate, and truthful information regarding Express Scripts' business, operations, management, and corporate conduct so that the market price of Express Scripts stock would be based on truthful and accurate information.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Express Scripts, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  The misconduct of the Individual Defendants involves a culpable violation of their obligations, the absence of good faith on their part, and a reckless disregard for the fiduciary duties owed to Express Scripts and its shareholders, which they were aware or should have been aware posed a risk of serious injury to Express Scripts.

42.     At all relevant times, each Individual Defendant was the agent of each other and of Express Scripts, and was acting within the course and scope of such agency.

9

## SUBSTANTIVE ALLEGATIONS

### A. Background to the Contract Between Anthem and Express Scripts

43.     Express Scripts is the largest PBM in the United States. PBMs administer pharmacy benefits and prescription drug programs for health-insurance providers. For the fiscal year ended December 31, 2015, Express Scripts reported more than $101.7 billion in revenues, and nearly $2.5 billion in net income. The PBM business accounts for the vast majority of earnings, representing 97.3% of Express Scripts' revenues for 2015, and 97.5% of revenues from 2013 to 2015.

44.     In its Annual Report filed on Form 10-K for the year ended December 31, 2015, Express Scripts recognizes that "[a] substantial portion of [Express Scripts'] business is concentrated in certain significant client contracts," including with Anthem, and "[i]f one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected." Between 2012 and 2015, Anthem accounted for between $12.9 and $16.6 billion of Express Scripts' revenues.

45.     The operative contract between Express Scripts and Anthem was signed contemporaneously with Express Scripts' acquisition of Anthem's "NextRx" subsidiaries, which had served as Anthem's in-house provider of PBM services. Express Scripts agreed to pay $4.675 billion up front as part of its acquisition of NextRx. The Anthem contract, along with Express Scripts' acquisition of NextRx, closed on December 1, 2009. In a press release issued that day, defendant Paz touted the benefits of Express Scripts' "strategic alliance" with Anthem.

46.     Pursuant to the contract between Express Scripts and Anthem, Express Scripts serves as Anthem's exclusive provider of PBM services for a ten year period from 2009 through 2019. Express Scripts is obligated to ensure, among other things, (1) the performance of its services in compliance

10

with all applicable laws and regulations, (2) accurate and timely pharmacy benefits administration and proper medication distribution, and (3) market competitive pricing.

47.     As one of the Company's largest contracts, the accounting treatment for the contract by Express Scripts was of particular significance to shareholders and the market. When Express Scripts entered into the contract in 2009, it amortized the costs of the customer contracts and relationships related to that contract over a 15 year period, representing to shareholders and the market that the Company had a sufficient basis under accounting rules to conclude it would renew the contract for at least an additional five years beyond its scheduled expiration in 2019.

48.     In response to an SEC comment letter in 2010 on this issue, Express Scripts explained the accounting treatment as follows:

> In determining the useful life for the 10-year contract with [Anthem], we assumed a high probability that the contract with [Anthem] would be renewed for a second term after the initial 10-year contract expired. This assumption is based on industry renewal rates, the Company's embedded relationship with [Anthem] and potentially significant efforts around the ability to change PBM providers. We have no reason to believe that a future [Anthem] contract renewal will differ materially from this historical experience. . . . When combining the initial ten year contract length with our probability adjusted renewal length of five years, we determined a 15 year useful life was most appropriate.

49.     The contract between Express Scripts and Anthem has a repricing provision to accommodate for fluctuating drug prices. Section 5.6 of the contract provides:

> **5.6 Periodic Pricing Review**. [Anthem] or a third party consultant retained by [Anthem] will conduct a market analysis every 3 years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing. In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to PBM and [Anthem] and PBM agrees to negotiate in good faith over the proposed new pricing terms. Notwithstanding the foregoing, to be effective any new pricing terms must be agreed to by PBM in writing.

50.     These types of repricing provisions are standard in the industry. As defendant Paz stated during a February 17, 2016 conference call with analysts, "if you look at our total book of

business, a lot of our clients do have what we call price checks. And in those price checks they have the right to look at pricing and make sure that we are doing the right things for them. Those are pretty routine and we go through those, bunches of those, every year."

51.     Thus, periodically Anthem conducts a market analysis "to ensure that [Anthem] is receiving competitive benchmark pricing." If Anthem determines that the pricing terms under the Agreement are no longer market competitive, then Anthem proposes new pricing terms "to ensure that [Anthem] is receiving competitive benchmark pricing," and Express Scripts is obligated to negotiate in "good faith over the proposed new pricing terms."

## B. The Repricing Dispute

52.     The first benchmark adjustment under the contract was scheduled for 2012. According to Anthem's allegations in its complaint against Express Scripts, the negotiations during this first price check in 2012 took approximately a year, and Anthem felt disadvantaged by having to "unfairly" pay above market pricing as the process dragged on. At the time, Express Scripts disclosed in an SEC filing that it and Anthem were "involved in a contractual dispute regarding certain terms of the [Anthem contract]," and Anthem "ha[d] raised the possibility of litigation to resolve these matters."

53.     Thus, the parties learned that negotiations needed to start well in advance of the repricing anniversary date, something Express Scripts expressly acknowledged. For example, the Company's top executive in charge of the Anthem relationship, Matt Totterdale, VP & GM (Anthem Division), sent an e-mail to Anthem on or about August 15, 2014, raising the issue of the next market check and the importance of initiating and pursuing the process at an earlier time.

54.     Anthem commenced the second round of negotiations in October 2014. Specifically, on October 17, 2014, Anthem demanded $13 billion in pricing concessions over the remaining four years of the contract, plus $1.8 billion in pricing concessions in the post-termination period. The sheer

size of the demand - almost $15 billion in concessions over the remaining term of the contract - made clear that renewal of the contract was potentially in jeopardy.

55. Even as the massive demand portended trouble, in response to an analyst's question during an October 29, 2014 conference call to discuss third quarter 2014 earnings, defendant Paz stated that "[Anthem]'s a great company and a great partner. We're doing some phenomenal things together . . . . *I think we've got a great relationship with them*. We've still got five years plus left on the contract. We love servicing them, and *our relationship is very strong and sound*. We're going to continue this relationship, and *we'll let you know as things unfold*."

56. On March 18, 2015, Anthem formally notified Express Scripts that it had conducted a market analysis with the aid of a third party health industry consultant under Section 5.6 of the contract, and determined that the pricing terms then in effect were not competitive. In accordance with Section 5.6, Anthem requested that Express Scripts provide, by March 30, 2015: (a) confirmation that the new pricing terms proposed by Anthem constituted competitive market pricing, or (b) alternative pricing terms for competitive benchmark pricing.

57. Express Scripts did not initially dispute that the pricing terms proposed by Anthem constituted competitive benchmark pricing and did not propose any other pricing terms. Rather, Express Scripts declined to engage in negotiations. In light of Express Scripts' refusal to negotiate, on April 1, 2015, Anthem provided formal notice of a breach under Section 6.2(a) of the contract. Pursuant to Section 6.2(a), Express Scripts was given a period to cure the breach, but Express Scripts continued to claim that it did not have to negotiate, and that it had a veto right over any negotiations.

58. For the next several months, Anthem attempted to get Express Scripts' attention, but with no success. On October 8, 2015, Anthem sent an e-mail to Express Scripts reiterating that Express Scripts had a contractual obligation to ensure that Anthem receives competitive benchmark

pricing, and that Anthem wished to speak with Express Scripts to negotiate for such pricing. On October 19, 2015, defendant Wentworth asked Anthem for a meeting, but indicated he wanted to discuss matters unrelated to competitive benchmark pricing. No meeting occurred.

59.     On November 5, 2015, Anthem again contacted Express Scripts to inquire about a meeting. On November 11, 2015, Anthem reached out to defendant Wentworth an effort to engage Express Scripts in negotiations. Anthem again asked that Express Scripts meet to negotiate for competitive benchmark pricing, but no meeting or negotiation occurred.

60.     On November 23, 2015, Anthem sent another e-mail to Express Scripts asking to meet to negotiate Anthem's pricing proposal, but no meeting or negotiations occurred. On December 2, 2015, Anthem sent a revised pricing proposal to Express Scripts, stating that while "competitive benchmark pricing" had actually "decreased" since Anthem's initial March 18, 2015 proposal, the revised proposal "provides for pricing that is higher than as originally proposed and, therefore, favors [Express Scripts]. We remain available to discuss pricing with [Express Scripts]. Please let me know when you are available to meet." But yet again, no meeting was scheduled.

61.     On December 14, 2015, Anthem emailed Express Scripts again, noting that no response to its previous communications had been received. Anthem asked the following questions: "1. Is [Express Scripts] willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing? 2. Is [Express Scripts] willing to reconsider its position that it has the right to veto competitive benchmark pricing to Anthem? 3. Will [Express Scripts] accept the pricing terms set forth in Anthem's revised proposal of December 2? We are ready, willing and able to respond to any inquiries you have about our competitive benchmark pricing proposal. 4. Has [Express Scripts] agreed to provide, or offered to provide, pricing terms to any other customer or potential customer on terms consistent with those that Anthem is requesting?"

14

62.    On December 15, 2015, Express Scripts responded that it was maintaining its position that it was not obligated to negotiate over Anthem's pricing proposal, and could simply veto the negotiations. In addition, Express Scripts also refused to disclose pricing terms that it was offering in the market to its other current or prospective customers.

63.    On January 7, 2016, Express Scripts made a proposal that would reduce pricing by only $1 billion, just 8% of what Anthem claimed to be entitled to receive, and still $12 billion in excess of what Anthem claimed was competitive benchmark pricing. On January 13, 2016, Anthem responded by stating that, for a limited time, it would consider less than competitive benchmark pricing to resolve the issue:

[Express Scripts'] excessive pricing is harming Anthem and its customers. Consequently, Anthem needs to resolve this matter quickly. In the interest of getting to a resolution, Anthem is prepared to accept something less than competitive benchmark pricing, as reflected in Anthem's proposal, in derogation of its contract rights, but obviously will not accept [Express Scripts'] grossly inflated pricing proposal. Please provide Anthem with a reasonable proposal that at least approaches the competitive benchmark pricing provided for in the Agreement. Please be advised that Anthem's willingness to accept less than competitive benchmark pricing as reflected in its proposal is limited in time, so [Express Scripts] needs to move quickly.

64.    When Express Scripts failed to respond, on January 22, 2016 Anthem communicated a third proposal, again less than competitive benchmark pricing. Anthem proposed a price reduction of only $11 billion over the remaining term of the contract, which was about $2 billion less than what Anthem claimed to be entitled to and could receive by moving to a new PBM vendor.

65.    Anthem again asked Express Scripts to meet to negotiate the terms, but on January 26, 2016, Express Scripts maintained its position that it was not obligated to provide competitive benchmark pricing. Express Scripts also continued its refusal to disclose the pricing terms it was offering in the market to its other current and prospective customers.

66.    Following a February 3, 2016 meeting with Anthem, Express Scripts again stated that it

was not obligated to negotiate over pricing terms. Nonetheless, Anthem made yet another proposal, this time proposing pricing that reduced value to Anthem by another $1.4 billion. Specifically, Anthem offered to accept a pricing reduction of only $9.7 billion, which was $3.4 billion less than what Anthem claimed it was entitled to receive and could receive from another PBM vendor.

67.    On February 5, 2016, Anthem submitted in writing the proposal discussed at the February 3, 2016 meeting with Express Scripts:

As you know, Anthem has now spent almost one year trying to engage [Express Scripts] in negotiations for competitive benchmark pricing, but [Express Scripts] has refused to do so. Consequently, Anthem and its members are paying inflated prices to Express Scripts, which is unsustainable. Obviously, Anthem should not have to bid against itself, but delay is inflicting substantial harm on Anthem and improperly enriching [Express Scripts]. So, as I told you at our meeting, in yet another effort to get [Express Scripts] to engage, and notwithstanding its right to lower pricing, Anthem proposes the pricing reflected on Exhibit A hereto, which is $3.4 billion more than competitive benchmark pricing available to Anthem in the marketplace. In other words, Anthem is prepared to overpay [Express Scripts] by approximately $3.4 billion in an effort to get [Express Scripts] to provide repricing, as it is required to do (at much lower amounts) under Section 5.6 of the Agreement. Anthem's willingness to accept pricing in excess of competitive benchmark pricing is limited in time, so we urge [Express Scripts] to move quickly with respect to Anthem's proposal. Otherwise, Anthem reserves all rights, including the right to the full amount of the pricing reduction necessary to achieve competitive benchmark pricing. . . . Anthem cannot continue under [Express Scripts'] current pricing, so please respond to Anthem's proposal by next week.

68.    On February 12, 2016, Express Scripts responded with a proposal that did not reduce pricing from its January 7, 2016 proposal. Instead, Express Scripts maintained its proposal for pricing that was $12 billion in excess of competitive benchmark pricing, plus more than another $1 billion for the post-termination transition period. And once again, Express Scripts refused to provide pricing information regarding its current and prospective customers.

69.    Notwithstanding Express Scripts' refusal to negotiate over the pricing terms proposed by Anthem, Anthem met with Express Scripts on February 18, 2016. At that meeting, Express Scripts again repudiated the contract by stating that it was not obligated to negotiate over the pricing terms

proposed by Anthem for competitive benchmark pricing or otherwise. Indeed, Express Scripts refused to negotiate at all, leaving Anthem to either take or leave the $12 billion proposal.

70.     Anthem CEO Swedish traveled to Chicago on March 1, 2016 to meet with defendant Paz. No progress was achieved, but Express Scripts stated that it would make a revised proposal. On March 17, 2016, more than two weeks after the March 1, 2016 meeting Express Scripts did not submit a revised proposal, but instead merely recycled its February 12, 2016 proposal. These were the final communications between Anthem and Express Scripts prior to litigation.

### C.  Operational Breaches

71.     Meanwhile, even as Anthem and Express Scripts were heading for litigation over their contentious pricing dispute, Anthem also alleged serious operational failures that further called into question the viability of the contract, and any prospect for its renewal.

72.     On February 16, 2015, Anthem served Express Scripts with notice of breach of the contract. That notice consisted of a 14-page single spaced letter detailing numerous operational breaches of the contract by Express Scripts. Those breaches included a failure to perform material operational duties in a "prudent and expert manner," as required under Section 3.1(a), due to alleged systems defects at ESI; inadequate personnel training; high employee turnover; a failure to allocate sufficient resources to its work; and a lack of expertise. Anthem threatened to terminate the contract if such breaches were not cured within a specified time frame.

73.     Even prior to the formal notice of breach, Anthem had notified Express Scripts about such operational issues. For example, over the course of 13 months prior to February 2015, Anthem repeatedly requested that Express Scripts correct a problem in its computer system that was preventing Express Scripts employees from correctly identifying certain necessary criteria. Anthem also issued multiple corrective action plans to Express Scripts, including for failure to perform required functions

17

related to the management of prescription drug event or "PDE" data, and failure to process and provide notification of coverage determinations within specified time periods.

74.    As another example, for two years prior to February 2015, Express Scripts allegedly had failed to implement certain required guidance which resulted in incorrect claim processing and Express Scripts' inability to accurately bill certain of Anthem's clients.

75.    In addition, Anthem had notified regulators of Express Scripts' failure to meet certain Medicare Part D functions multiple times throughout 2014. For instance, on September 22, 2014, Anthem notified regulators that Express Scripts had failed to build coverage determinations based on eligibility timelines. On November 10, 2014, Anthem notified regulators of Express Scripts' failure to contact members for the consent required for mail order prescriptions. On November 20, 2014, Anthem notified regulators that Express Scripts had failed to fill mail order prescriptions on a timely basis. On December 18, 2014, Anthem notified regulators that Express Scripts had an unscheduled system outage for approximately 24 hours due to operator errors and design deficiencies.

76.    Section 16.5 of the Anthem contract provides that in the event of a material dispute regarding performance, the parties must first submit to a dispute resolution process. In March 2015, the parties' dispute concerning Express Scripts' alleged operational breaches of the Anthem contract went through the dispute resolution procedures, but without resolution, thereby demonstrating that such dispute was material and put renewal of the Anthem contract at serious risk.

77.    Meanwhile, the operational shortcomings simply continued. For example, under the Anthem Contract, the parties established a joint database called the WellPoint RX Issues Tracking System, or "WRIT," to track and monitor issues related to Express Scripts' performance of PBM services for Anthem. The WRIT system allows Anthem to submit issues relating to Express Scripts' failure to perform its obligations, and Express Scripts is required to research and resolve those issues.

18

78.     Between April 17, 2015 and December 31, 2015 Anthem brought 156 new issues relating to Express Scripts' performance of PBM services to Express Scripts' attention.

79.     In addition, as later revealed by the Anthem lawsuit, Express Scripts violated the contract in several material respects regarding performance, including (a) failure to apply correct criteria in processing requests for prior authorization, largely due to the failure of an inadequately tested software program known as C360, (b) failure to comply with contractual obligations and regulatory requirements concerning the submission, processing, management and reporting of PDE files, as well as those relating to member cost share reconciliation, (c) failure to satisfy mandated turnaround times with respect to processing Medicare Part D claims, (d) failure to correct defects in claims processing, and (e) failure to resolve issues in the WRIT database.

80.     Furthermore, as revealed in the Anthem lawsuit, since the February 16, 2015 notice of breach of contract, Express Scripts poor contract performance has continued throughout 2015 and 2016, including (a) failing to manage the Direct Member Reimbursement Program, (b) making errors with respect to the Plan Limit Authorization Indicator, (c) making errors with respect to Daily Cost Share List, and (d) making errors with respect to the National Provider Identifier system.

### D. Anthem Sues Express Scripts

81.     On March 21, 2016, Anthem sued Express Scripts in the U.S. District Court for the Southern District of New York, alleging that Express Scripts breached the contract by failing to negotiate pricing terms in good faith under Section 5.6 and that Express Scripts breached its contractual obligation to perform operational duties in a "prudent and expert manner."

82.     The complaint revealed that Anthem had attempted to renegotiate drug pricing since early 2015, that negotiations with Express Scripts had never even approached resolution, and that Anthem believed Express Scripts had violated its operational obligations under the Anthem contract.

The complaint also revealed that Anthem had served notices of default under the contract on February 16, 2015 and April 1, 2015 concerning the operational and pricing obligations.

83.     On April 19, 2016, Express Scripts countersued and further detailed the contentious and ongoing nature of the Anthem relationship and the pricing negotiations. While Anthem's initiation of litigation informed shareholders and investors that Anthem believed Express Scripts had not acted in good faith, Express Scripts' counterclaims served to confirm that both companies believed their relationship was broken and a resolution on repricing was unlikely.

84.     Indeed, Express Scripts alleged that it was "regrettably forced to bring these counterclaims in order to seek redress for Anthem's repeated failures to comply with its contractual obligation to negotiate in good faith." In its counter complaint, Express Scripts criticized "Anthem's failure to negotiate in good faith over its proposed new pricing terms," called Anthem's demand "unreasonable," contended that "Anthem has concocted a new interpretation of the parties' rights and obligations," accused Anthem of breaching the implied covenant of good faith and fair dealing, and demanded $4.675 billion restitution of its own under an unjust enrichment theory.

85.     Underscoring the acrimony, on an earnings conference call on April 26, 2016, an analyst asked defendant Paz regarding the litigation. Paz admitted that "this is probably going to be quite a long, drawn out situation. . . . If they want to come in and have a conversation that's reasonable in nature, nothing to do with $3 billion, *that's pretty ludicrous*. You've heard me say that before. We're open to that. . . . But at the end of the day, we're in a legal process now."

### E.  False Statements Regarding the Anthem Contract

86.     From February 2015 through March 2016, as the pricing and operational disputes between Express Scripts and Anthem were intensifying, Express Scripts and its officers and directors nevertheless sought to portray the relationship with Anthem as solid, and accounted for the contract as

20

if it were likely to be renewed at the end of its term in 2019, when it was not.

87. As alleged below, these statements were false and misleading, as they failed to acknowledge (a) the pricing dispute in 2011 and 2012, which had harmed the relationship between Express Scripts and Anthem and threatened the viability of the relationship going forward; (b) the contentious negotiations over pricing that had persisted since October 2014 and continued through 2015 and into 2016, with no resolution in sight, (c) the magnitude of Anthem's demand of approximately $15 billion in concessions; (d) the notice of breach of contract with respect to operational issues Anthem served on Express Scripts on February 16, 2015; and (e) the notice of breach of contract with respect to pricing Anthem served on Express Scripts on April 1, 2015.

88. Under these circumstances, it was likely that Anthem would either terminate or at least not renew the Anthem contract in 2019, or that Express Scripts and Anthem would modify or renew it on terms materially less favorable to Express Scripts. Given these facts, Express Scripts was required by GAAP (ASC 350-30-35-9) to timely reevaluate and revise the remaining useful life of the intangible assets related to the Anthem contract in its financial statements, and amortize the carrying amount of such assets over a period of less than 15 years, as had been set at the outset of the Anthem contract, when Express Scripts "assumed a high probability" that the Anthem contract would be renewed for a second term after the initial 10 year contract expired.

89. For example, on February 23, 2015, Express Scripts filed with the SEC a Form 8-K and press release and its Annual Report on Form 10-K, announcing financial results for the fourth quarter of 2014 and full-year 2014. The 2014 10-K stated that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States."

90. The 2014 10-K contained certifications by defendants Paz and Havel, including that they "designed such internal control over financial reporting, or caused such internal control over

21

financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

91.    The February 23, 2015 8-K and press release stated:

Revenue amortization is related to the customer contract with Anthem (formerly known as WellPoint) which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $26.9 million ($16.7 million net of tax) and $28.5 million ($18.0 million net of tax) is included as a reduction to revenue for the three months ended December 31, 2014 and 2013, respectively. Intangible amortization of $112.4 million ($70.0 million net of tax) and $114.0 million ($70.1 million net of tax) is included as a reduction to revenue for the year ended December 31, 2014 and 2013, respectively.

92.    Also in the 2014 10-K, Express Scripts discussed its accounting treatment of the Anthem contract. Specifically, Express Scripts reported: "Customer contracts and relationships related to our 10-year contract with Anthem (formerly known as WellPoint) under which we provide pharmacy benefit management services to Anthem and its designated affiliates are being amortized using a modified pattern of benefit method over an estimated useful life of 15 years." That statement represented to shareholders and investors that Express Scripts accounted for the ten year Anthem contract as if it likely would be renewed for at least an additional five years.

93.    The 2014 Form 10-K was signed by defendants Paz, Havel, Breen, Delaney, LaHowchic, MacMahon, Mergenthaler, Meyers, Palmore, Roper and Sternberg.

94.    On February 25, 2015, defendants Paz, Wentworth, Queller and Havel, among others, held an investor conference call with analysts. During that conference call, an analyst asked whether "there was any update" on the Anthem relationship as "[o]bviously that's a big focus, big client for you guys." Defendant Queller replied:

[W]e've got a great relationship with Anthem. We're right now working with them very closely to help them prepare for their 1/1/16 business . . . . Our teams work together closely each and every day. *The relationship is very, very, solid.* I know they've made mention in Investor Days about contract negotiations, things of that nature. . . . I can tell you that we're helping them roll out new states . . .

*and it's business as usual*. And we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well. But we'll continue to work with them very, very closely just as we always do to make them successful.

95.     These statements for the fourth quarter and full year 2014 were false and misleading. The contractual relationship between Anthem and Express Scripts was in reality severely and adversely impacted by the pricing and operational disputes alleged herein.

96.     On April 28, 2015, Express Scripts filed with the SEC a Form 8-K and press release and its Quarterly Report on Form 10-Q announcing the Company's financial results for the first quarter of 2015. The Form 10-Q stated that "the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in" the 2014 10-K, which attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States." The Form 10-Q was signed by defendants Paz and Havel and contained sworn certifications by them attesting to the completeness and accuracy of the Form 10-Q and its financial statements and internal controls.

97.     In the April 28, 2015 8-K and press release, Express Scripts stated:

Revenue amortization is related to the customer contract with Anthem (formerly known as WellPoint) which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.8 million ($14.9million net of tax) and $28.5 million ($17.6 million net of tax) is included as a reduction to revenue for the three months ended March 31, 2015 and 2014, respectively.

98.     The Form 10-Q discussed Express Scripts' accounting treatment of the Anthem contract. Specifically, Express Scripts reported:

Amortization of $23.8 million and $28.5 million for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known as WellPoint) has been included as an offset to revenues for the three months ended March 31, 2015 and 2014, respectively. The future aggregate amount of amortization expense of other intangible assets is expected to be approximately $1,747.0 million for 2015, $1,741.0 million for 2016, $1,324.0 million for 2017, $1,313.0 million for 2018 and $1,307.0 million for 2019.

99.     The Form 10-Q was signed by defendants Paz and Havel.

100.    On April 29, 2015, defendants Paz, Wentworth, and Havel, among others, held an earnings conference call. During that call, an analyst asked: "Can you please talk about your relationship with Anthem? I'm sure you guys have a very good relationship with them. I think you're about 5 years into a 10-year deal." Defendant Paz responded that "Anthem is an incredibly important client to us. And I think we do very good things together. So we really enjoy that relationship. We really enjoy providing services to their members. . . . So I do think it is a two-way street."

101.    These statements for the first quarter of 2015 were false and misleading. The contractual relationship between Anthem and Express Scripts was in reality severely and adversely impacted by the pricing and operational disputes alleged herein.

102.    On July 28, 2015, Express Scripts filed with the SEC a Form 8-K and press release and its Quarterly Report on Form 10-Q announcing the Company's financial results for second quarter of 2015. The Form 10-Q stated that "the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in" the 2014 10-K, which attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States." The Form 10-Q was signed by defendants Paz and Havel and contained sworn certifications by them attesting to the completeness and accuracy of the Form 10-Q and its financial statements and internal controls.

103.    In the July 28, 2015 8-K and press release, Express Scripts stated:

Revenue amortization is related to the customer contract with Anthem which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.8 million ($14.8 million net of tax) and $28.5 million ($17.7 million net of tax) is included as a reduction to revenue for the three months ended June 30, 2015 and 2014, respectively. Intangible amortization of $47.6 million ($29.7 million net of tax) and $57.0 million ($35.3 million net of tax) is included as a reduction to revenue for the six months ended June 30, 2015 and 2014, respectively.

104.    The Form 10-Q discussed Express Scripts' accounting treatment of the Anthem

contract. Specifically, Express Scripts reported:

> Amortization of $23.8 million and $28.5 million for the three months ended June 30, 2015 and 2014, respectively, and $47.6 million and $57.0 million for the six months ended June 30, 2015 and 2014, respectively, for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known as WellPoint) has been included as an offset to revenues. The annual aggregate amount of amortization expense of other intangible assets is expected to be approximately $1,757.0 million for 2015, $1,744.0 million for 2016, $1,329.0 million for 2017, $1,317.0 million for 2018 and $1,311.0 million for 2019.

105.   The Form 10-Q was signed by defendants Paz and Havel.

106.   These statements for the second quarter of 2015 were false and misleading. The contractual relationship between Anthem and Express Scripts was in reality severely and adversely impacted by the pricing and operational disputes alleged herein.

107.   On October 27, 2015, Express Scripts filed with the SEC a Form 8-K and press release and its Quarterly Report on Form 10-Q announcing the Company's financial results for the third quarter of 2015. The Form 10-Q stated "the disclosures contained in this Form 10-Q are adequate to fairly state the information when read in conjunction with the Notes to the Consolidated Financial Statements included in" the 2014 10-K, which attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States." The Form 10-Q was signed by defendants Paz and Slusser and contained sworn certifications by them attesting to the completeness and accuracy of the Form 10-Q and its financial statements and internal controls.

108.   In the October 27, 2015 8-K and press release, Express Scripts stated that:

> Revenue amortization is related to the customer contract with Anthem which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.8 million ($14.9 million net of tax) and $28.5 million ($18.0 million net of tax) is included as a reduction to revenue for the three months ended September 30, 2015 and 2014, respectively. Intangible amortization of $71.4 million ($44.6 million net of tax) and $85.5 million ($53.3 million net of tax) is included as a reduction to revenue for the nine months ended September 30, 2015 and 2014, respectively.

109. The Form 10-Q discussed Express Scripts' accounting treatment of the Anthem contract. Specifically, Express Scripts reported:

> Amortization of $23.8 million and $28.5 million for the three months ended September 30, 2015 and 2014, respectively, and $71.4 million and $85.5 million for the nine months ended September 30, 2015 and 2014, respectively, for customer contracts related to our agreement to provide PBM services to members of the affiliated health plans of Anthem (formerly known asWellPoint) has been included as an offset to revenues. The annual aggregate amount of amortization expense of other intangible assets is expected to be approximately $1,759.0 million for 2015, $1,743.0 million for 2016, $1,329.0 million for 2017, $1,317.0 million for 2018 and $1,311.0 million for 2019.

110. The Form 10-Q was signed by defendants Paz and Slusser.

111. These statements for the third quarter of 2015 were false and misleading. The contractual relationship between Anthem and Express Scripts was in reality severely and adversely impacted by the pricing and operational disputes alleged herein.

112. On December 22, 2015, defendants Paz, Wentworth, Slusser, and others hosted a conference call with analysts to discuss Express Scripts' guidance for 2016. Defendant Paz told the analysts that he "want[ed] to address the status of our contract with Anthem, a topic many of you have asked us about." He continued: "We are *currently in discussions* with Anthem regarding the periodic pricing provisions of the agreement. We previously engaged in this review process in 2012, and following several months of discussions, that process ultimately resulted in *mutually beneficial agreement* between both Express Scripts and Anthem." He added that: "We are excited to *continue productive discussions with Anthem* regarding our relationship."

113. Defendant Paz further stated that "*we are fully committed to reaching a mutually beneficial agreement, and continuing our successful working relationship*. Since 2009, we have delivered quality care for Anthem's members, and I am proud of what our teams have accomplished." On the call, an analyst asked: "Is an Anthem repricing considered in the 2016 guidance? And if not, can you quantify the earnings risk that could be related to the repricing?" Defendant Paz responded that "it is not included in the guidance, because *we're very early on*. And we're in that process, and we're working our way through it"

26

114.   Defendant Paz's statements misrepresented Express Scripts' relationship and the status of its negotiations with Anthem as "very early on," "current" and "productive," as well as the parties' prior 2012 negotiations as "mutually beneficial" and that there was a substantial likelihood that Express Scripts and Anthem would continue their "successful working relationship" and extend the contract beyond 2019. Defendant Paz's statements obscured the numerous failed attempts by both Anthem and Express Scripts to negotiate pricing and operational issues throughout 2015.

115.   These statements regarding 2016 guidance were therefore false and misleading. The contractual relationship between Anthem and Express Scripts was in reality severely and adversely impacted by the pricing and operational disputes alleged herein.

116.   On February 16, 2016, Express Scripts filed with the SEC a Form 8-K and press release and its Annual Report on Form 10-K announcing the Company's financial results for the fourth quarter of 2015 and full year 2015. The Form 10-K was signed by defendants Paz, Slusser, and Wentworth, among others, and attested that the Company's financial statements "conform[ed] to generally accepted accounting principles in the United States" It also contained sworn certifications attesting to the completeness and accuracy of the financial statements and the internal controls.

117.   The February 16, 2016 8-K and press release stated:

> Revenue amortization is related to the customer contract with Anthem which commenced upon closing of the NextRx acquisition in 2009. Amortization of intangibles that arises in connection with consideration given to a customer by a vendor is characterized as a reduction of revenues. Intangible amortization of $23.7 million ($14.8 million net of tax) and $26.9 million ($16.7 million net of tax) is included as a reduction to revenue for the three months ended December 31, 2015 and 2014, respectively. Intangible amortization of $95.1 million ($59.4 million net of tax) and $112.4 million ($70.0 million net of tax) is included as a reduction to revenue for the year ended December 31, 2015 and 2014, respectively.

118.   In the Form 10-K, Express Scripts discussed its accounting treatment of the Anthem contract, reporting that "Customer contracts related to our 10-year contract with Anthem under which we provide pharmacy benefit management services to Anthem and its designated affiliates ("the PBM agreement") are being amortized using a modified pattern of benefit method over an estimated useful

27

life of 15 years." Express Scripts stated that it was "*currently in discussions* with Anthem regarding the periodic pricing review process pursuant to the terms of our PBM agreement with Anthem," and further reassured shareholders and investors that "we are actively engaged *in good faith discussions* with Anthem and intend to continue to comply with the requirements of the agreement."

119. The 2015 Form 10-K was signed by defendants Paz, Slusser, Wentworth, Breen, Delaney, Lahowchic, MacMahon, Mergenthaler, Meyers, Palmore, Roper and Sternberg.

120. On February 17, 2016, defendants Paz, Slusser, and Wentworth, among others, held an earnings conference call with analysts. At the start of that call, defendant Paz told the analysts that "Our team is delivering great service to Anthem and its members. That has not changed" and that "*we remain fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract. That has not changed.*"

121. Also on that call, an analyst asked defendant Paz: "George, I do appreciate . . . you not wanting to get into the weeds on Anthem so I'm hoping this is a fairly general question. I think on your 2016 guidance call back in December when you voluntarily brought up that 2012 Anthem price review, I think the point you were trying to make is that these reviews are somewhat routine and eventually resolved and that investors shouldn't get too worked up about this. . . . [I]s there any color on why you think that review back in 2012 seemed to reach a mutually beneficial conclusion without much fanfare but this one just seems to be more contentious? What's changed so much since then, in your view, just generally speaking?" Defendant Paz stated that such negotiations were routine, and further represented that Express Scripts was "*focused on reaching agreement*" with Anthem.

122. These statements for the fourth quarter and full year 2015 were false and misleading. The contractual relationship between Anthem and Express Scripts was in reality severely and adversely impacted by the pricing and operational disputes alleged herein.

### F. The Truth Is Revealed

123. As alleged herein, in January 2016, Anthem's CEO stated publicly that Anthem was entitled to savings of $3 billion a year under its contract with Express Scripts, and intimated that a renewal of the contract beyond 2019 was uncertain.

124. These comments were reported in the financial press and led to a sharp decline in Express Scripts' stock price in light of the significance of the Anthem contract to Express Scripts' annual revenues. In a January 12, 2016 article entitled *Express Scripts Plunges as Biggest Client Threatens to Leave*, *Bloomberg* reported additional comments by Anthem's general counsel, who stated: "We have a very involved dispute resolution process in the contract that has been fully exhausted." Although he acknowledged that Anthem and Express Scripts "remain[ed] in dialogue," he went on to say, "Both of us have to step back and see whether we're honoring the contractual terms of the agreement," and if not, "you have your legal remedies."

125. In March 2016, after its concerns regarding Express Scripts' operational breaches and drug pricing remained unaddressed, Anthem sued Express Scripts in the U.S. District Court for the Southern District of New York, alleging breach of contract and seeking termination.

126. According to Anthem's lawsuit, Express Scripts deliberately delayed the repricing process for months, refused to negotiate in good faith over Anthem's pricing proposals for competitive benchmark pricing, expressly repudiated its contractual obligations to reprice to "ensure Anthem receives competitive benchmark pricing," and failed to offer anything close to competitive benchmark pricing, as required. In addition, Anthem alleged that Express Scripts materially breached its obligation to perform material operational duties in a "prudent and expert manner" due to Express Scripts' system defects, chronic failure to devote sufficient resources, inadequate training of personnel, inordinately high employee turnover, and lack of required expertise.

127. Because Anthem was Express Scripts' most significant client, these revelations were absorbed by shareholders and the market and caused a massive decline in the price of Express Scripts stock, wiping out billions of dollars in shareholder value. Indeed, prior to the initial disclosure of the drug pricing problems by Anthem's CEO in January 2016, the price of Express Scripts' stock was approximately $85 per share. After the January 2016 disclosure by Anthem's CEO and the March 2016 filing of Anthem's lawsuit against Express Scripts, however, the price of Express Scripts' stock sank to approximately $69, a decline of almost 20%.

128. Then, on April 25, 2016, forced to act by the lawsuit, Express Scripts finally disclosed

29

that the Anthem contract would likely *not be renewed* beyond 2019. In its Form 10-Q for the first quarter of 2016, Express Scripts reported that it had adjusted its accounting treatment of the Anthem contract to amortize the contract's costs over its ten year term, rather than over a 15 year useful life, which had been based on an assumed likelihood of renewal under GAAP.

129. Specifically, in the section of the Form 10-Q discussing Express Scripts' intangible assets, the Company first described how it had been amortizing the contract over the course of a 15 year useful life. "*However, due to the sequence of recent events regarding our discussions with Anthem, culminating in the filing of the lawsuit on March 21, 2016, we felt it prudent to consider the increased likelihood of either non-renewal or renewal on substantially different terms such that, beginning in March 2016, we began amortizing our agreement with Anthem over the remaining term of the contract* (i.e. using a life of 10 years from the time the agreement was executed in 2009). Previously, we amortized the agreement over 15 years."

130. According to the Form 10-Q, "therefore, the intangible asset amortization associated with the Anthem agreement will run through the remaining term of the contract at the end of 2019, reducing the previous amortization period by 5 years. *This change increases intangible asset amortization by $10.5 million for the first quarter of 2016 and quarterly intangible asset amortization by approximately $32.0 million beginning in the second quarter of 2016.*"

131. Thus, Express Scripts admitted, after years of contrary accounting treatment (including after receiving Anthem's two notices of breach of contract in early 2015), that there was not a supportable basis to represent that it was likely that the Anthem contract would be renewed. That decision resulted in a significant offset to the Company's revenues of $10.5 million for the first quarter of 2016, and $32 million quarterly beginning in the second quarter of 2016.

## HARM TO THE COMPANY

132. As alleged herein, once the truth came out, securities class action litigation was promptly filed against Express Scripts and its executives on May 4, 2016. The Individual Defendants' conduct has not only caused a massive decline in shareholder value, but has also exposed Express Scripts to huge liability to stock purchasers, including huge defense costs.

133.   Express Scripts' failure to maintain its relationship with Anthem has also damaged the Company's reputation within the business community. In assessing PBM services, Express Scripts' customers consider a company's ability to comply with its contractual obligations. Express Scripts' ability to attract and retain potential customers is now impaired.

134.   In addition, Express Scripts has incurred other costs, including but not limited to, costs incurred from defending and paying any settlement in the action brought by Anthem, and costs incurred from compensation paid to defendants who breached their duties to Express Scripts.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

135.   Plaintiff brings this action derivatively on behalf of Express Scripts to redress injuries suffered, and to be suffered, by Express Scripts as a direct result of violations of the breaches of fiduciary duty and waste of corporate assets alleged herein.  Express Scripts is named as a nominal defendant solely in a derivative capacity.

136.   Plaintiff will adequately and fairly represent the interests of Express Scripts in enforcing and prosecuting its rights and has hired experienced counsel.  Plaintiff was a shareholder of Express Scripts at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Express Scripts shareholder.

137.   Express Scripts is controlled by its Board, which at the time this action was commenced, consisted of twelve (12) members: defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth. Plaintiffs have not made a pre-suit demand on the Express Scripts Board to institute this action, because such a demand would be a futile and useless act, and therefore, is excused.

138.   Defendants Paz and Wentworth are not independent. In its 2016 Proxy Statement of Form 14, the Company concedes that defendants Paz and Wentworth lack independence under Nasdaq listing standards. Furthermore, defendants Paz and Wentworth are defendants in the securities

31

class action, where the lead plaintiff alleges that they engaged in securities fraud. These defendants would never vote to investigate or pursue claims under these circumstances, and demand on these defendants is therefore excused.

139. Defendants Sternberg, LaHowchic, Mergenthaler and DeLaney served as members of the Audit Committee during 2015 and 2016. In this role, these defendants had a special relationship with the Company, and were required to discuss with management "the Company's major financial risk exposures." These defendants knew the significance of the Anthem contract, and thus knew or recklessly disregarded the significant issues the Company was experiencing related to its contract negotiations with Anthem, and the impact of these issues had on the Company's financial results for 2014 and the first through fourth quarters and full year 2015, and to its financial guidance for 2016.

140. In particular, as members of the Audit Committee with responsibilities related to the Company's financial reporting, these defendants knew or recklessly disregarded that the manner in which the Company amortized the Anthem contract was in violation of GAAP, in light of the deteriorating nature of the relationship between Express Script and Anthem as of early 2015, which made the renewal of the contractual relationship no longer a viable assumption.

141. Despite their knowledge or reckless disregard of these matters, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney caused or permitted the improper statements to be made in SEC filings. Accordingly, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Sternberg, LaHowchic, Mergenthaler and DeLaney face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

142. Defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth breached their fiduciary duties of loyalty by

making, approving, or allowing the Company to make improper statements in its press releases and public filings concerning the Company's deteriorating relationship with Anthem, as well as its financial results for 2014 and the first through fourth quarters and full year 2015, and its financial guidance for 2016. Each of these defendants knew of the importance of the valuable Anthem contract to the Company's business and to its disclosures. For example, after identifying Anthem as a "significant" client, the 2014 Form 10-K, signed by the directors, specifically stated that: "If one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected and we could experience a negative reaction in the investment community resulting in stock price declines or other adverse effects." Nevertheless, each director signed one or more SEC filings containing false and misleading information regarding the Anthem contract. These defendants face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

143.    Defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg and Wentworth failed to ensure that the Company satisfied its contractual obligations to negotiate with Anthem, its largest and most important client, even after Anthem served multiple notices of breach of contract and attempted over a period exceeding a full year to reach agreement with Express Scripts on pricing and operational issues, as alleged herein. According to the Company's SEC filings, "[i]f one or more of our large clients either terminates or does not renew a contract for any reason or if the provisions of a contract with a large client are modified, renewed or otherwise changed with terms less favorable to us, our financial results could be materially adversely affected." The failure of these defendants to protect the viability of the Anthem contract in the face of these risks amounts to a breach of fiduciary duty, exposing the defendants to a

33

substantial likelihood of liability, and demand is therefore excused.

144. Demand is further excused in that the defendants would never jeopardize the substantial benefits they receive in their positions as officers and directors, as alleged herein. These amounts are material, and they are material to each defendant. Demand is therefore excused.

145. Demand is further excused because the Company is named as a defendant in the pending securities class action, and if the Company pressed forward with its claims against the defendants in this case, then the Company's efforts could undercut or even compromise the defense of the securities class action, excusing demand.

## COUNT I

## BREACH OF FIDUCIARY DUTY

### (Against the Individual Defendants)

146. Plaintiff incorporates by reference the allegations set forth above.

147. Each of the Individual Defendants was a director and/or officer of Express Scripts during relevant times, and as such owed to the Company fiduciary obligations. In violation of these fiduciary duties of good faith, candor, and loyalty, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to shareholders regarding the Company's business, financial condition, and revenue recognition. These Individual Defendants knew or recklessly disregarded that the statements about Express Scripts' business and its financial condition were false and misleading when made.

148. The preparation and dissemination of inaccurate SEC filings and press releases alleged herein represents a failure by the Individual Defendants to assure the existence within Express Scripts of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting. Further, when put on

notice of the Anthem problems, the Individual Defendants had a fiduciary duty to promptly take appropriate action to correct the misconduct and prevent its recurrence.

149.   Defendants willfully ignored obvious and pervasive problems with Express Scripts' internal controls alleged herein, and by deliberate and knowing indifference failed to make a good faith effort to correct the problems until it was far too late.

150.   Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to shareholders materially inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures. Even while on notice, defendants further failed to protect the Company from risks associated with the management of its most important contract. These actions could not have been a good faith exercise of prudent business judgment.

151.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision. By virtue of their conduct alleged herein, the Individual Defendants engaged in intentional misconduct and knowing violations of law.

152.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Express Scripts has sustained significant damages, not only monetarily as alleged herein, but also to its corporate reputation and goodwill.

153.   As a result of the misconduct alleged herein, defendants are liable to Express Scripts.

### COUNT II

### CONTRIBUTION AND INDEMNIFICATION

### (Against the Individual Defendants)

154.   Plaintiff incorporates by reference the allegations set forth above.

155.   Express Scripts is alleged to be liable to private persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual

Defendants' liability to Express Scripts.

156.   Express Scripts' alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

157.   Express Scripts is entitled to contribution and indemnification from each of the Individual Defendants in connection with all such claims that have been, are, or may in the future be asserted against Express Scripts by virtue of the Individual Defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Express Scripts, demands judgment as follows:

A.   Determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of Express Scripts for said action;

B.   Declaring that the Individual Defendants have violated their fiduciary duties to Express Scripts and its shareholders;

C.   Awarding Express Scripts the damages sustained by Express Scripts as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

D.   Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that plaintiff has an effective remedy;

36

E.      Awarding plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: December _6_, 2016

By:_____

Richard Fosher
Oakes & Fosher, LLC
1401 South Brentwood Boulevard
Suite 250
St. Louis, MO 63144
(314) 428-7600

Robert C. Schubert
Willem F. Jonckheer
Schubert Jonckheer & Kolbe LLP
Three Embarcadero Center, Suite 1650
San Francisco, California 94114
(415) 788-4220

*Attorney for Plaintiff*

## **VERIFICATION**

I, Randy Green, declare as follows:

I am the plaintiff in this action. I verify that I have read the attached shareholder derivative complaint and authorize its filing. To the extent the allegations in the complaint are based on my personal knowledge, they are true; to the extent they are based on information and belief through the investigation of my counsel, I believe them to be true.

Executed on _November 15_, 2016 in _San Francisco, CA_.

_____
Randy Green